In the Matter of the Estate of Louis Comfort Tiffany, Deceased.

Surrogate's Court, Nassau County, December 11, 1935.

.. 

*White & Case*, for Charles L. Tiffany and another, as executors and trustees of Louis Comfort Tiffany, deceased.

*Peck & Hancock*, for the Louis Comfort Tiffany Foundation.

*Michael A. Petroccia*, special guardian.

*John J. Bennett, Jr., Attorney-General* [*Robert P. Beyer, Assistant Attorney-General*, of counsel], for the beneficiaries of the bequest to the foundation.

*Rathgeber & Noyes*, for Annie M. Philips, a beneficiary.

*Winthrop, Stimson, Putnam & Roberts*, for Mary W. T. Lusk and others, beneficiaries.

*Platt & Walker*, for William T. Lusk and others, legatees and contingent remaindermen.

HOWELL, S. The testator, Louis Comfort Tiffany, died January 17, 1933, leaving a will dated June 17, 1921, and four codicils dated, respectively, February 5, 1923, July 9, 1925, May 13, 1927, and October 2, 1929. His surviving next of kin were his son, Charles L. Tiffany, and his four daughters, May Tiffany Lusk, Julia Tiffany Parker, Comfort Tiffany Gilder and Dorothy Tiffany Burlingham. He appointed his son, Charles L. Tiffany, and his secretary, George F. Heydt, as his executors and trustees. The wills and codicils were admitted to probate and letters testamentary issued to the named executors, who now seek judicial settlement of their intermediate accounts as such, presenting questions for determination involving construction of the will and codicils and the effect and validity of certain of their provisions.

The testator, Louis Comfort Tiffany, was a son of Charles Louis Tiffany, founder of the well-known business of Tiffany & Company, retail jewelers, silversmiths and goldsmiths. The business was founded as a partnership in 1837 and was incorporated in 1868. The founder, Charles L. Tiffany, was president, treasurer, director and largest stockholder from time of incorporation until his death. Upon his death his stock passed under his will to his children, his son, Louis Comfort Tiffany, receiving 289 shares in addition to 50 shares given to him by his father in his lifetime. He became director and vice-president of Tiffany & Company, and continued to hold office as director until his death, and as vice-president to within seven months of his death. He neither sold nor bought any additional Tiffany & Company stock. He gave, however, 81 shares to his children and 80 shares to the Louis Comfort Tiffany Foundation, leaving him the owner in 1920 of 178 shares. At that time there was a " split-up " of the par value stock of Tiffany & Company into non-par value stock in the proportion of five to one, so that the testator received 890 shares of the new stock. He never disposed of any of it and died owning those 890 shares and no others. The Tiffany & Company stock was never listed on any stock exchange, never had any " over the counter " market, and was never procurable in any general market. It was always a closely held family stock and at testator's death about one-third of it was owned by the Tiffany family and the balance by two other families. By his will and codicils the testator bequeathed 50 shares to each of his four daughters, 50 shares in trust for his nurse and housekeeper, Sarah E. Hanley, for life, remainder to his residuary estate and 150 shares to the Louis Comfort Tiffany Foundation. This disposed of 400 of the 890 shares. The balance passed under the residuary clause of the will in trusts for the benefit of his children for life, remainders to their issue. The inventoried value of the stock at testator's death was $800 per share.

On July 30, 1918, the testator formed the institution known as the " Louis Comfort Tiffany Foundation " by executing and delivering to the trustees named therein three instruments as follows:

(1) A trust deed of real property, being a portion of his extensive estate at Laurelton, in the town of Oyster Bay, Nassau county, N. Y., pursuant to section 115 of the Real Property Law.

(2) A trust deed of personal property consisting of preferred and common stocks therein enumerated (including the 80 shares of Tiffany & Company stock above referred to) of a total value at that time of nearly $1,000,000, pursuant to section 14 of the Personal Property Law.

(3) A letter of instructions to the trustees.

In both the trust instruments the testator recited that he desired " to promote the public welfare by founding, endowing, and having maintained an educational institution within this state by conveying to the trustees herein named, and to their successors " the real and personal property therein described. He further provided:

" (1) The nature of the institution to be founded is an art institute, the object and purposes of which are art education directed toward both art appreciation and production, within the scope of the industrial as well as the fine arts, and as one means toward those educational purposes the establishment and maintenance of a museum to contain objects of art.

" (2) The name by which it shall be known is: Louis Comfort Tiffany Foundation.

" (3) The powers and duties of the trustees and the manner in which they shall account, are all the powers and duties of trustees of a membership corporation organized under the laws of the State of New York, subject only to such limitations upon such powers and duties as are herein expressly stated, and the manner in which they shall account is the same manner in which the trustees of such membership corporations are required to account, subject as aforesaid.

" (4) The mode and manner and by whom the successors to the trustees named herein are to be appointed is by election of the remaining trustees to fill any vacancy in their number, however created. The trustees hereby appointed may add to their number other trustees by the vote or written designation of a majority of them; may prescribe by the adoption of a constitution their respective terms of office and the manner in which their successors shall be elected or appointed. Trustees other than those herein named so elected and appointed, and successor trustees, shall have the same powers herein given to the original trustees named."

The testator reserved, however, the right, during his lifetime, to approve such additional trustees and such constitution and elected likewise, during his lifetime, to perform the duties and exercise the powers enjoined upon and vested in the trustees but did not thereby prevent his devolving upon them any or all such powers and duties either permanently or from time to time. He likewise reserved the right during his lifetime to alter, amend or modify the terms and conditions of the trust and to absolute dominion over the rents, issues and profits of the real and personal property conveyed to the trustees. He named seven trustees and appointed Robert W. de Forest and George F. Heydt as secretary

878

and treasurer of the trustees until they should organize and provide for the election or appointment of officers.

In his letter of instructions to the trustees accompanying the trust deeds the testator said: " I have, by instruments of even date with this letter, given to you as trustees certain real and personal property therein described. I have done this pursuant to my intention of promoting the public welfare by this Foundation. Most of you know of my general plans from personal conference with me. I am relying upon you in the event of my death to carry them out."

After referring to the rights reserved to him during his lifetime, he further wrote:

" Nevertheless, in the line of complete understanding, it is my wish and expectation that you will, by appropriate resolution, provide as follows:

" That only the income of the securities given to the Foundation shall be used for its support and maintenance; that the principal given, whether it continues to be invested in the securities I have transferred or is otherwise invested, shall always remain intact; that you have the power of investment and re-investment except as to the stock of Tiffany & Company; that the stock of Tiffany & Company during my lifetime, shall remain in my name, that I retain the right to vote thereon and that after my death no sale of the same shall be made until an option shall have been given to the then directors or trustees of Tiffany & Company by notice in writing to purchase the same either for themselves or for other than stockholders of Tiffany and Company, at any price at which it is proposed to sell, and that it shall not be sold to others until thirty days after the expiration of such option.

" If at any time it should seem desirable to the Trustees to obtain a charter from the Regents, or organize under the General Education Law, I wish them to have full power and authority to do so."

Messrs. de Forest and Heydt, named by the testator as president and secretary respectively of the trustees of the foundation, accepted the grants and received and deposited the securities and on September 12, 1918, the trustees met and formally approved and ratified their action.

Subsequent to the original grants, additional gifts were made to the foundation by the testator and they also received gifts from Miss Louise Tiffany and Mr. Charles W. Gould. The trustees conducted the activities of the foundation at Laurelton aforesaid in the buildings and upon the land conveyed to them by the testator. Such activities were financed from the income of the

securities given them by the testator and others, which income was exempted from taxation, as was the real property, upon the ground that the foundation was an educational institution. The income was expended in the upkeep of buildings and grounds and in the conduct of a school on the premises for education of students in art, none of the income being applied to any other purpose, except payment of salaries to employees for services in effecting the objects of the foundation.

The activities of the foundation were conducted from May to October in each year. Students were selected by circularizing leading art schools for examples of work and for recommendations. A committee was chosen by the trustees which examined the work and recommendations submitted and chose those whose work was considered best. Those chosen were invited to the foundation for the season. They received their board and lodging and were given all the facilities of the foundation to work out their artistic problems. Those chosen were generally well advanced in their work and were permitted to continue along their own lines, subject to supervision and criticism by the resident director and visiting artists. The students were under no expense except for the material they used in their work. Exhibitions were held at which their work was shown and in the fall an annual exhibition was held in New York city, at which the best of the season's work was displayed.

In addition to the resident students, art teachers were permitted to bring their classes to the foundation for sketching, etc., and the main building of the foundation containing objects of art was open to inspection by those applying for the privilege. This privilege, however, as well as the choice of students and the manner of their selection, rested entirely in the discretion of the trustees. Until recently the number of resident students was approximately twenty-five, but has now decreased to eight or ten due to shrinkage of the income of the trust.

The powers reserved to the testator during his lifetime of course ceased with his death. He had not altered or modified the terms of the trust and upon his death it became absolute, all the powers and duties being vested exclusively in the trustees.

By his will and codicils the testator made the following provisions for the foundation:

In paragraph fifth of his will (dated June 17, 1921) he gave his real and personal property in Florida " to Louis Comfort Tiffany Foundation, an educational institution organized and existing under the laws of the State of New York, or to its Trustees."

In the first paragraph of his first codicil (dated February 5, 1923) he bequeathed non-par stock of Tiffany & Company as follows:

(a) " to Louis Comfort Tiffany Foundation, fifty (50) shares."

(b) " To Louis Comfort Tiffany Foundation, an educational institution organized and existing under the laws of the State of New York, in memory of my father Charles Louis Tiffany, one hundred (100) shares.

" I direct that the income from fifty (50) of said shares shall become part of the reserve fund of the Foundation, to be used by the Trustees only when in their judgment an emergency exists requiring such use.

" I further direct that the income from the other fifty (50) shares be used for scholarships, fellowships or prizes to aid and stimulate students."

In the same paragraph of that codicil he gave twenty-five shares of said stock to Sarah E. Hanley, but if she should predecease him, he gave the same " to the Louis Comfort Tiffany Foundation." This bequest was increased to fifty shares in paragraph third of the third codicil (May 13, 1927). Both such bequests, however, were revoked by the fourth codicil (October 2, 1929) and in lieu thereof fifty shares of said stock were left in trust for Sarah E. Hanley for life, remainder to pass as part of the residuary estate.

In the sixth paragraph of his third codicil he gave " to the Louis Comfort Tiffany Foundation all the furniture and other contents of my home at Laurelton, located there at the time of my death."

The first question presented is as to the validity of these gifts to the foundation or its trustees, and whether they are entitled to take them under the will and codicils. In determining that question the will and codicils must be read and construed together and in connection with the trust deeds creating the foundation. The references to the foundation in the will and codicils as " an educational institution organized and existing under the laws of the State of New York " imports of necessity reference to the trust deeds (*Matter of Rausch*, 258 N. Y. 327; *Matter of Andrus*, 156 Misc. 268), and the bequests must be considered as made to the trustees under those deeds for the purposes of the trusts therein created. For those purposes the income only of the property given could be used. Similar provision is made with respect to the gift of one hundred shares of Tiffany & Company stock in the first codicil, the use of the income from that particular gift being restricted as therein provided.

Obviously the testator did not intend the vain act of making bequests to an unincorporated association not entitled to take. He had created the " foundation," stated its objects and purposes, named its trustees, provided for their successors, imposed upon them the duties and conferred upon them the powers of trustees

of a membership corporation under the laws of this State, endowed them with real and personal property; with instructions as to investment, reinvestment and application of income, all in conformity with the statutes (Real Prop. Law, § 115; Pers. Prop. Law, § 14). The " foundation " as thus established was in operation at the dates of execution of the will and codicils. The gift in the will was to the foundation " or to its trustees." The gifts in the codicil to the foundation must be similarly construed as gifts to it or to its trustees. The gift in the first codicil expressly provides for the application of the income by the trustees of the foundation to certain of its purposes. The gifts, therefore, are to the trustees of the foundation as such trustees, in trust to apply the income to the purposes of the foundation as expressed in the trust instruments, and in the will and codicils.

Even if the testator has not used express words of trust, a trust for the purposes stated will be implied. (*Matter of Durbrow*, 245 N. Y. 469; *Manley* v. *Fiske*, 139 App. Div. 665; affd., 201 N. Y. 546.) In the *Durbrow* case testatrix gave her residuary estate to her executor or executrix to distribute where he, or she as his successor or substitute, in his or her judgment, shall consider it will be most effective in the advancement of Christ's kingdom on earth." The court said (p. 477): " Objection is made that testatrix made no formal gift in trust. A gift in trust will be implied," citing *Manley* v. *Fiske* (*supra*), wherein the will provided: " I desire my executors to divide the surplus among societies which will assist poor needlewomen," and the court said (by MILLER, J.): " It is true that there are no express words creating a trust, as there are no express words of gift; but it is quite plain that a trust was intended. A trust is almost inseparably involved with a gift for charitable uses. * * * I see no difficulty in the way of upholding this provision as a trust for charitable uses, the object of it being the assistance of poor needlewomen."

Concededly such a trust as the testator has here created, with indefinite beneficiaries, and not limited by lives in being, would have been invalid prior to the enactment of the so-called Tilden Act (Laws of 1893, chap. 701, as amd. by Laws of 1901, chap. 291, and now contained in section 113 of the Real Property Law and section 12 of the Personal Property Law). Since that enactment, however, it has uniformly been held that the law of charitable uses as it existed at the time of the American Revolution was restored, and that the doctrine favorable to charitable uses was again at least as broad as declared in the case of *Williams* v. *Williams* (8 N. Y. 525; see, also, *Matter of Davidge*, 200 App. Div.

437); and that thus the restrictions against indefiniteness of beneficiaries and perpetuities were removed. (*Allen* v. *Stevens*, 161 N. Y. 122; *Matter of MacDowell*, 217 id. 454.)

That statute applies to a "gift, grant, bequest or devise to religious, educational, charitable or benevolent uses." If a trustee is named to execute it, legal title to the property vests in him, and if otherwise valid, will not be deemed invalid by reason of the indefiniteness or uncertainty of the beneficiaries.

Thus educational and charitable uses are placed upon the same footing. It is established law in this State that a gift for the promotion of education or learning is a gift for charitable uses if the purpose is the promotion, not of private profit, but of public learning. (*Butterworth* v. *Keeler*, 219 N. Y. 446; *Hamburger* v. *Cornell University*, 204 App. Div. 664; affd., 240 N. Y. 328.)

"If the purpose to be attained is personal, private or selfish, it is not a charitable trust. When the purpose accomplished is that of public usefulness unstained by personal, private or selfish considerations, its charitable character insures its validity." (*Matter of MacDowell*, 217 N. Y. 454, at p. 460.)

If the will is susceptible of two constructions, one of which will uphold the disposition and the other of which will invalidate it, the construction which sustains its validity will be adopted. (*Matter of MacDowell, supra*, p. 465; *Seitz* v. *Faversham*, 205 N. Y. 197.)

"A construction which is fairly within the rules of law and that sustains the trust and devotes the fund included therein to purposes permitted by law and to the good of humanity should be preferred." (*Matter of Robinson*, 203 N. Y. 380, 388; followed and applied in *Matter of Cunningham*, 206 id. 601, 606.)

Thus the declared public policy of the State is that of a generous attitude toward charitable trusts. This attitude has been adopted by the courts and they have consistently applied the rule of liberal construction to charitable bequests.

"The intention to make a gift for charitable and religious purposes pervades and dominates the whole bequest, and the court will give it effect if it is possible so to do by the application of the most liberal rules of construction that the law will permit. (*Harrington* v. *Pier*, 105 Wis. 485.) If, however, the gift thus sought to be established as distinguished from its beneficiaries, is so indefinite and uncertain as to include uses which are not in a broad sense charitable and religious, but may be personal, private or selfish in their character, its benevolent purpose will not save it. (*Matter of Cunningham*, 206 N. Y. 601, 605; *Matter of Frasch*, 245 N. Y. 174, 182.) If, on the other hand, a definite charitable purpose may be found within the limits of a testator's language; if, for

example, it is reasonably clear that a testator had in mind that his bequest should be devoted only to purposes of Christian charity, his language should be construed in a broad and liberal spirit in accordance with his intention and the gift upheld, although the will may be susceptible of a construction which would permit the gift to be used for private or secular purposes " (citing authorities). (*Matter of Durbrow*, 245 N. Y. 469, 474.)

In that case a gift by testatrix of her residuary estate to her executor to distribute where he " shall consider it will be most effective in the advancement of Christ's Kingdom on earth " was sustained as a charitable trust valid under Personal Property Law, section 12, the court saying (p. 475): " Broadness of scope and generality of purpose do not in themselves breed impossibility of execution."

In *Matter of Robinson* (*supra*) was involved the gift of the residuary estate to two individual trustees " to disburse the principal or interest, or both, of said fund in their discretion as follows, to wit: To provide shelter, necessaries of life, education, general or specific, and such other financial aid as may seem to them fitting and proper to such persons as they shall select as being in need of the same. Preference is to be given to persons who are elderly or disabled from work, and to persons who are Christians, of good moral character, members of one of the so-called Evangelical churches, to wit, the Methodist, Baptist, Presbyterian, Congregational, Moravian or Episcopal, and who are not addicted to the use of intoxicants or tobacco, nor to attendance at theatrical entertainments."

The two trustees were authorized to appoint not to exceed five others to act with them as trustees and the trust devolved upon them and the survivors. It was sustained as a valid charitable trust and its validity was not affected by the provisions for preference and for " specific " education. The court said (at p. 388): " It authorizes the use of the money included in the trust to furnish an ' education, general or specific.' A specific education is no more without the charitable purpose of the testatrix than is a general education;" and the court held that an educational use within the meaning of the statute was not confined to a general education.

In *Matter of Cunningham* (*supra*) there was a gift to executors and trustees " to be by them applied in their best judgment and discretion to such charitable and benevolent associations and institutions of learning for the general uses and purposes of such associations and institutions as my said executors may select, and in such sums respectively as they may deem proper." Applying

the liberal rule of construction stated in *Matter of Robinson* (*supra*), the court applied the word " charitable " to the term " institutions of learning " and sustained the trust.

By a similar application of the rule a trust for distribution among " such religious, charitable and educational corporations as they may designate " was sustained as serving a public purpose, and affirmed without opinion. (*Edgar* v. *Waldo*, 227 N. Y. 658.)

In *Manley* v. *Fiske* (*supra*), involving a direction to pay the trust fund to any society that assists poor needlewomen, it was held that such society was under a legal duty to apply the amount received for a charitable purpose, sufficiently indicated to enable the court to control the action of the trustee.

In *Matter of MacDowell* (*supra*) the trust was to apply the income to hiring and maintaining a house " as a Home for Refined, Educated, Protestant, Gentlewomen, whose means are small, and whose home is made unhappy, by having to live with relatives." Preference was to be given " to my sister Jessie, and my cousins, and their lineal descendants forever " (naming them). " The same privilege is extended to my friends " (naming several). "All the inmates of this Home are to pay board, each week they are there, with their small means. The price not to exceed seven dollars per week; towards paying the running expenses of the house." This was sustained as a charitable trust, its charitable purpose not being destroyed by the provisions for preference.

In *Butterworth* v. *Keeler* (219 N. Y. 446) the court found the gift of half the residuary estate to an unmistakably charitable institution an aid in sustaining as valid a trust of the other half of the residuary estate to be used and devoted to the establishment of a school for girls in the town of North Salem. Judge CARDOZO said (at pp. 450, 451): " They are to organize a new school; and unless we can say that they are to organize it for profit, the school will be a charity. But plainly there was no intent that they should organize it for profit. They are at liberty, if they wish, to make the tuition free, but even though it is not free, the conclusion must be the same. If profit was the purpose, the will would have told us to whom the profits were to go. * * * It is plain that profit is not contemplated; that revenue not expended is to be added to the endowment; and that the purpose of the gift is charity. Extrinsic evidence is not needed to make this purpose clear. It may, however, reinforce the conclusion to which we should be led without it."

In *Matter of Frasch* (245 N. Y. 174) the trust was to establish a fund for chemical research and to pay the net income to " one or more incorporated institutions in the United States, which shall

be selected by the said trustee after advising with The American Chemical Society, upon the condition that the said institutions shall agree that the money so received shall be devoted to research in the field of Agricultural Chemistry, with the object of obtaining results which shall be of practical benefit to the agricultural development of the United States." Holding the trust valid, the court said (at p. 186): " A bequest for such use is clearly within the provisions of our statute for ' charitable uses.' Any institution to which income of the bequest is paid must apply it to a public use. No institution not authorized to apply to such use the moneys received by it could have been within the intention of the testatrix. Even if the testatrix intended that the trustee might use as an instrument in the execution of the trust a private corporation authorized to carry on research for the public benefit, if any such corporation exists, the fact that the money was ear-marked for a ' religious, charitable, educational or benevolent use ' would render inconsequential the circumstance that the corporation had also other objects which are selfish in purpose."

In *Matter of Davidge* (200 App. Div. 437) the testatrix, asserting in her will her belief in the advantages of education for the service of humanity, established an educational fund and authorized her trustees in their discretion to devote the whole or any portion of the income " either to one person or to several persons, for such period or periods of time as the said trustees in their discretion may determine, for the purpose of assisting such person or persons to prepare for his or her or their life work, and I authorize the said trustees to confer the benefit of the said Fund upon any person or persons domiciled within the United States, of either sex, or of any age, creed, nationality or race, without limiting that preparation to a college education or a professional education, but specifically providing that it may embrace any education of any nature or kind whatsoever in the discretion of the trustees tending to fit the beneficiary for a life of useful work." Sustaining the trust, the court said (at pp. 439, 440): " The clear intent of the testatrix was to provide assistance to beneficiaries in securing an education tending to fit the beneficiary for a life of useful work. The beneficiaries were to be selected by her trustees. Her intent is clearly expressed in her own language in the 1st sentence of the clause wherein it is stated: ' It is my intention by this my last will and testament to provide for the establishment of an Educational Fund to be devoted to educational uses.' * * * It seems clear that the purpose of the testatrix was within the language of section 113 of the Real Property Law (as amd. by Laws of 1909, chap. 144, and Laws of 1919, chap. 71) and section

12 of the Personal Property Law (as amd. by Laws of 1909, chap. 144, and Laws of 1911, chap. 220), which statutes authorize gifts 'to religious, educational, charitable or benevolent uses.' There is no suggestion of a private purpose or private gain. The whole purpose expresses a charitable use to aid part of the public in attaining an education to prepare them for their life work."

In *City Bank Farmers Trust Co.* v. *Arnold* (268 N. Y. 297) was involved a deed of trust by Mary Gertrude Abbey, widow of an American artist, Edwin Austin Abbey, whereby upon her death the greater part of the principal was devoted to purposes broadly educational and benevolent in a manner intended to perpetuate the name and fame of her husband. A portion of the principal was to be paid to the trustees in New York of the American Academy in Rome, the same to be kept invested and the income to be used by an association to be formed, through a council of eight members with prescribed qualifications, to establish and award scholarships, the holders of which were to follow courses of study in mural painting formulated and supervised by the council in accordance with the known ideals of Edward Austin Abbey for the training of a mural painter. The academy rejected the donation. In an action to construe the deed of trust and to determine what disposition should be made of the rejected gift, the court rejected the contention that the donation was an outright gift, with the result that the gift being rejected, the *cy pres* doctrine was inapplicable; and on the contrary held that the courts below had correctly construed the provision as creating a charitable trust, that rejection of the donation did not result in a failure of the gift and that under the *cy pres* doctrine new trustees should be appointed to carry out the purposes of the settlor in accordance with the general plan outlined in the deed of trust.

In *Matter of Judd* (242 App. Div. 389) the testatrix gave $30,000 to John Hopkins Hospital as a cancer fund in trust to pay the net income as follows: One thousand dollars each year to the person who, in the judgment of the trustees of the hospital, shall have made the greatest advancement toward discovery of a cure for cancer, the balance of the income to be paid to the hospital for the relief and comfort of poor patients suffering from cancer. Upon proof satisfactory to the hospital trustees of the discovery and perfection of a cure for cancer, the principal of the trust to be distributed one-half to the hospital to be used in research work and for the relief of poor cancer patients, and the other one-half to be distributed to the person or persons discovering and perfecting the cure for cancer. The surrogate had held the trust invalid because it provided for a gift to an individual or individuals for

his or their own use. The Appellate Division reversed, saying (at pp. 390, 391): " We think this conclusion proceeds upon too restricted a conception of a charitable use. In reaching it the surrogate considered only the immediate destination of the funds and disregarded what seems to us the dominant purpose and the wider implications of the trust. If the purpose of the trust were merely to benefit research workers in cancer it would not be saved by reason of the useful nature of their work. (*Matter of Beekman,* 232 N. Y. 365; *Matter of Kennedy,* 240 App. Div. 20; affd., 264 N. Y. 691.) But this involves, we are convinced, a misconception of its purpose. That purpose is the encouragement of research in the field of cancer by rewarding those who shall have been most useful in the investigation of a subject which has baffled the medical profession. It is not to be supposed that it was the intention to enrich the unidentified individuals who might happen to be successful in this research work, except as this was incidental to the achievement of a purpose to benefit mankind. The real beneficiaries are those afflicted who are expected to benefit by the research which may be stimulated by the hope of pecuniary reward. The trust is not invalid merely because it contemplates payments to individuals for their private use. That situation exists in any charitable trust which requires for the discharge of its functions the employment of compensated employees. They, too, receive emoluments ' for his or their own use.' Yet it will not be contended that such charities are created in order to compensate their employees. They are created, as was the trust here, to secure the advantage of their services in effectuating the objects of the charity. Wherever the question seems to have arisen it has been decided in this way. (*Thompson* v. *Thompson,* 1 Coll. 381; 63 Eng. Rep. 464; *Almy* v. *Jones,* 17 R. I. 265; *Palmer* v. *Union Bank,* Id. 627; *Coleman* v. *O'Leary's Executor,* 114 Ky. 388; *Heald* v. *Johnson,* 204 Iowa, 1067.) "

Returning then to the trust in the instant case, we find the purpose clearly and definitely expressed " to promote the public welfare by founding, endowing and having maintained an educational institution * * * the object and purposes of which are art education directed toward both art appreciation and production within the scope of the industrial as well as the fine arts, and as one means toward those educational purposes the establishment and maintenance of a museum to contain objects of art." This, however, was but one means, the others lay in the discretion of the trustees; but whatever means should be employed they were required to constitute " art education directed toward both art appreciation and production." The " endowment " was made

by the testator in his lifetime and by his letter of instructions accompanying the trust instruments the principal of the endowment was to be kept invested and the income to be devoted to the support and maintenance of the foundation. These instructions, and the objects and purposes of the trust were being carried out during the testator's lifetime and the income devoted to affording opportunity to art students to pursue their studies without expense and under appropriate conditions and supervision. This was the situation when testator executed his will and codicils and is reflected especially in the gift of 100 shares of Tiffany & Company stock in the first codicil, the income of 50 shares to " become part of the reserve fund of the Foundation, to be used by the Trustees only when in their judgment an emergency exists requiring such use," and the income from the other 50 shares to be " used for scholarships, fellowships, or prizes to aid and stimulate students."

Nowhere in the trust instruments, will or codicils is there any suggestion of operation for private gain or profit. On the contrary, the dominant purpose of the testator is clearly educational, benevolent and charitable, a purpose dictated by his own appreciation of, interest and activity in art and art education and by his desire to assist in the education of others in art appreciation and production, in accordance with his belief that the public welfare would thus be promoted. Under the authorities discussed above and applying the rules and principles therein laid down, it is my conclusion that the gifts in question in the will and codicils of the testator are gifts to the trustees of the foundation in trust for the purposes of the foundation and are valid trusts under the statutes. (Real Prop. Law, § 113; Pers. Prop. Law, § 12.)

Another question presented is whether the bequests by the testator of shares of stock of Tiffany & Company are specific or general legacies. The bequests were of " non-par stock of Tiffany & Co." The history of Tiffany & Company and of its stock has been summarized above. The 890 shares of that stock which testator received he continued to hold, owned it when he made his will and codicils, and owned it when he died. In the first codicil he bequeathed 50 shares to each of his four daughters, 25 shares to his nurse, Sarah E. Hanley, 50 shares to the foundation absolutely and 100 shares with restrictions as to the use of the income. In the third codicil he increased the bequest to Sarah E. Hanley from 25 to 50 shares and in the fourth codicil he provided that such 50 shares be held in trust for her life, to become a part of his residuary estate upon her death. This disposed of 400 shares; the balance passed to the residuary estate. In the first codicil he expressly ratified the provisions of his will and thus among

others the tenth paragraph: " I wish all my specific and general legatees to receive their legacies free and clear of all transfer, inheritance or legacy taxes and I direct that all such taxes be paid out of my residuary estate." In the second codicil he provided: " I wish all my specific and general legatees to receive their legacies free and clear of all transfer, inheritance or legacy taxes and I direct that all such taxes upon the legacies set forth in this second codicil of my will, as well as in the first codicil thereof, be paid out of my residuary estate." These provisions were ratified by testator in the third and fourth codicils.

In order to hold these legacies of stock specific it is necessary to find that the testator in making them intended to bequeath the actual shares which he owned. One expression from which such intention might be inferred is his use of the term " specific legatees " quoted above. The only bequests in the first two codicils thus referred to which could be held to be specific are the bequests of Tiffany & Company stock. Another expression may be found in the provision that in case a daughter should predecease him, the stock bequeathed to her should go to his executors and trustees to dispose of or hold in trust in the manner provided in his will with reference to his residuary estate. Of some significance also is the fact that all of the stock in question was given by him either to his children or in trust for their benefit or to the foundation in trust for its purposes, except for the payment of income from 50 shares to his nurse during her lifetime. And in that connection also may be considered the provision in the first codicil restricting the foundation to the use of the income only from the 100 shares bequeathed to its trustees as well as the provisions in the letter of instructions to those trustees confining them to the use of income only and forbidding a sale of the stock itself unless it had first been offered to the directors of Tiffany & Company. Had these bequests been of " *my* " stock in Tiffany & Company, the legacies would clearly be specific. But " The law is not so unscientific as to insist upon the use of the word ' my ' when other words may clearly indicate the intention of the testator to give shares then in his ownership." (*Matter of Security Trust Co.*, 221 N. Y. 213, at p. 220.) In that case the testator bequeathed a total of 2,024 " shares of stock of the Kee Lox Manufacturing Company," giving specified numbers of shares to specific named relatives and employees. It was a " closely held " corporation. Testator had been one of its incorporators, owned about half of its stock and had been active in its management. There was no open market for the stock. The testator owned 2,024 shares when he made his will and when he died. His will directed that all

taxes on the legacies be paid out of his residuary estate. Upon the principle that the intention of the testator governs in determining whether or not a legacy is specific, the court held that the legacies of stock were specific, saying (at p. 219): " Here clearly is an intention to give to the legatees named the specific stock which the testator held in the Kee Lox Manufacturing Company at the date of his will and at the time of his death."

In *Matter of Mitchell* (114 Misc. 370) the testator bequeathed to named legatees specified numbers of " shares of the capital stock of Life Publishing Company." The corporation had been organized by testator and one Miller. There were 1,000 shares of its stock outstanding of which Miller owned 250 and testator 750 when he made his will and at his death. The stock was " closely held " and was not publicly dealt in. Holding the legacies specific, Surrogate FOLEY said (at p. 373):

" In *Matter of Security Trust Co.* (*supra,* 219) Mr. Justice CRANE says: ' It is the intention of a testator, as gathered from his entire will, which determines whether the legacy be general or specific.' A very slight indication of an intention to give shares owned by him when the will is executed is enough to make the legacy specific. (*Thayer* v. *Paulding,* 200 Mass. 98.)

" The indications of intent in this will are just as strong as those in *Matter of Security Trust Company.* The stock of the Life Publishing Company was not publicly dealt in. The corporation here was even a closer one, with but two stockholders. * * * Mr. Mitchell must have known that his executors would not be able to replace the stock bequeathed by him in case he disposed of it, in whole or in part, during his lifetime. His will disposes of the exact number of shares owned by him at the time it was executed. At his death he possessed the same amount of stock."

In *Matter of Strasenburgh* (136 Misc. 91; affd., 228 App. Div. 880) the testator bequeathed 400 shares of stock in R. J. Strasenburgh Company to each of his two business associates and 4,000 shares to his son. Testator had founded the corporation and conducted its operations. The stock was closely held and not offered to the public. Holding the legacies specific the court said (pp. 96, 97): " In the will he does not say ' my ' shares, nor ' all shares belonging to me,' as does *Matter of Evans* (104 Misc. 641, 643); yet any testator, if he mentions a particular thing generally, means to give what he then has of that kind; and if it be ascertained that at his death he had on hand the exact amount of stock shares which he gave by such legacies, this fact alone, ' though not controlling, is significant.' Being shares in his own

business, run by him down till about the date of the will, almost as a one-man company, these shares were not offered to the public, but were closely held, by him and his wife — the greatest part of the stock being in their hands — and the rest being in the hands of his trusted business associates mentioned in the will, and some small lots held by employees, it was not likely he referred in the will to shares thereafter to be acquired either by him or by his executor; but intended those he then had and later kept."

In *Matter of Beecroft* (146 Misc. 344) where testator bequeathed one share of stock of the Falcon Trucking and Forwarding Company to each of four employees, the court, holding the legacies to be specific, said (at p. 347): " The legacies of the stock provided for in paragraph third are specific. The fact that the testator owned practically all of the capital stock of the corporation, coupled with its non-public character, brings the gift within the rule laid down in *Matter of Security Trust Company* (221 N. Y. 213) and *Matter of Mitchell* (114 Misc. 370)."

Other authorities of the same import are *Matter of Martin* (252 N. Y. 582, revg. 225 App. Div. 724); *Matter of Moore* (151 Misc. 658), and *Matter of Hebbard* (142 id. 41). In the case last cited Surrogate SLATER, commenting upon *Tifft* v. *Porter* (8 N. Y. 516), said (at p. 42): " The most that this case holds is that a gift of public stock is a general legacy when there is nothing in the will to indicate that it is a gift of the testator's stock."

I find in the instant case that testator intended to bequeath the stock in Tiffany & Company that he owned and that consequently the legacies are specific. It follows that the specific legatees of that stock are entitled to be paid in full, and that they are likewise entitled to receive the dividends declared and paid thereon since testator's death, as unquestionably such dividends upon stock specifically bequeathed follow the stock into the hands of the specific legatees. (*Matter of Security Trust Co., supra; Matter of Strasenburgh, supra.*)

A further question is presented with reference to the legacies to the children of testator's daughter, Mrs. Burlingham. In his second codicil he provided as follows:

" *First.* I give the sum of Ten Thousand Dollars ($10,000) to each of my following named grandchildren, viz.: William T. Lusk, Louis T. Lusk and Louise Platt, children of my daughter Mrs. Graham Lusk; Joy Gilder, Helen Gilder, Richard Gilder and Rodman Gilder, children of my daughter Mrs. Rodman Gilder; Comfort T. Parker and Mary Parker, children of my daughter, Mrs. Gurdon Parker.

" I give the sum of Five thousand Dollars ($5,000) to each of my grandchildren, Robert Burlingham, Mary Burlingham, Katrina Burlingham and Michael Burlingham. I also give Five thousand Dollars ($5,000) to each of the following named children of my friend, Mrs. George Sanford Hornblower, Rosilla M. Hornblower, William B. Hornblower, Emily Hornblower and Marshall Hornblower. I also give the sum of Five Thousand Dollars ($5,000) each to Harry Platt and Robert Platt, children of my granddaughter, Mrs. Louise L. Platt.

" I also give Ten thousand Dollars ($10,000) to each of the following named friends: George F. Heydt, Joseph Briggs and Mrs. Frank Philips."

This provision indicates clearly a scheme or plan adopted by the testator for legacies to all his grandchildren, the children of his four daughters. He gave $10,000 to each of said grandchildren, except the four children of his daughter, Mrs. Burlingham, to each of whom he gave $5,000 as he did to each of the children of his friend, Mrs. Hornblower, and of his granddaughter, Mrs. Platt.

Realizing that certain of these children were minors, he provided in his third codicil as follows:

" *First.* By the first clause of the second codicil to my will I have given various sums to my grandchildren, to the children of my friend Mrs. George Sanford Hornblower and to the children of my granddaughter Mrs. Louise L. Platt. I wish to avoid the burden of guardianship and guardianship proceedings as respects all of these children who may be minors at the time of my death. As respects all such minors, I revoke the legacies given to each under the said first clause of the second codicil to my will, and in lieu thereof give the amount which each minor child would have received under that codicil to the mother of such child if living, or if not living then to the father of such child, or if both father and mother be dead, then and then only to each such child. It is my confident expectation that any parent receiving this legacy will apply it to the use of each child so that each child will hold me in remembrance, but my gift to each parent is none the less absolute by reason of my statement of this expectation."

This provision applied uniformly and impartially to all such children and indicates clearly the plan and intent of the testator to avoid the expense of guardianship if possible by providing that the children's legacies be paid to their respective parent or parents if living, and to the children only in the event that both their parents be dead. The only non-uniformity still remaining, therefore, was the distinction between the children of testator's daughter Mrs. Burlingham, who were to receive only $5,000 each, instead

of the $10,000 given to each of the other grandchildren. This situation the testator changed by the following provision in his fourth codicil:

"*Fifth.* I give to each of my grandchildren, viz.: Robert Burlingham, Jr., Mary Burlingham, Katrina Burlingham and Michael Burlingham, the sum of Ten Thousand Dollars ($10,000) in lieu of the Five thousand Dollars ($5,000) given to each by the second paragraph of the first clause of my Second Codicil."

Thus the testator made uniform his legacies to his grandchildren, placing them all on the $10,000 basis, instead of leaving one set, *i. e.*, the children of Mrs. Burlingham, with only $5,000 each. I can find no indication of an intent to change the plan or scheme of payment of such legacies so carefully adopted in the third codicil. On the contrary, in the fourth codicil, the testator expressly ratified, confirmed and republished the provision referred to of the third codicil, thus specifically repeating the plan or scheme. I do not find that the situation is altered by the provision in article sixth of the fourth codicil for a legacy of $5,000 to a named great-grandchild. This was an entirely new legacy, to a legatee theretofore unprovided for. Furthermore it is significant that, as to this new legacy, the gift is specifically made to the father for the use of the child. Such provision was necessary in case of this new legacy to a new legatee, which would not be governed by the provision of the third codicil. It was not necessary, however, as to the increase of the legacies to the children of Mrs. Burlingham from $5,000 to $10,000, because the provision in the third codicil, ratified in the fourth codicil, already applied to those legatees. All parts of these codicils must be construed together and in relation to each other and in such a way, if possible, as to reconcile differences and contradictions, and to form a consistent whole. (*Matter of Title Guarantee & Trust Co.*, 195 N. Y. 339, at p. 344.)

So construing these codicils and thus preserving what appears to me to be the testator's scheme and intent, it is my determination that the provision in article fifth of the fourth codicil merely increases the legacies to each of the children of Mrs. Burlingham from $5,000 to $10,000, and leaves them still subject to the provisions of article first of the third codicil for payment to the mother or father if living.

It having been determined that the legacies of stock of Tiffany & Company are specific legacies, it appears that the net personal estate of the decedent applicable to payment of the general legacies is insufficient to pay them in full. The question is, therefore, presented whether the payment of such general legacies is a charge upon the real estate. The testator owned both real and personal

property when he made his will and the various codicils and at the time of his death he left property which consisted of non-income producing realty in this and in other States. At the date of the making of his will and at dates of the making of the various codicils the value of his personalty was more than sufficient to meet payment of all the general legacies in full. Concededly the testator did not expressly charge the payment of such legacies upon his real estate. It must, therefore, be determined whether such an intention may be implied or inferred.

" Whether a legacy is charged upon the real estate of the decedent is always a question of the testator's intention. The language of the will is the basis of the inquiry, but extrinsic circumstances which aid in the interpretation of that language, and help to disclose the actual intention, may also be considered." (*Ely* v. *Megie,* 219 N. Y. 112, at p. 127.)

The rule is an old one that real estate is not charged with the payment of legacies unless the testator has expressly so charged it, or unless his intention so to do may be fairly inferred from the language and dispositions of the will. The result of this rule is that, all things being equal, it is presumed that a legacy is not to be paid in full unless there is enough personalty left after payment of debts and administration services to satisfy all legacies, which presumption will prevail in the absence of an express contrary direction or unless such a contrary intention may be satisfactorily inferred from the will itself.

Much has been written as to the origin of this rule in the English courts because of the distinction between wills of real and personal property, its early adoption in this country and the anomalous condition that has resulted from the adoption of a rule based upon English precedents and not fully applicable to conditions in this country and particularly so because of the tendency here to treat real estate and personalty on the same basis, which has finally culiminated in the recent statutory provisions to that effect.

Extended discussion is unnecessary in view of the recent decisions examining the subject at length, particularly those of the Court of Appeals in *Carley* v. *Harper* (219 N. Y. 295) and *Ely* v. *Megie* (Id. 112), of Surrogate SLATER in *Matter of Mould* (117 Misc. 1; affd., 204 App. Div. 889; affd., 236 N. Y. 582) and of Surrogate WINGATE in *Matter of Lilienthal* (139 Misc. 225), and others.

In these decisions we find a thorough discussion and complete analysis of all the precedents indicating the elements which have particularly appealed to the courts as being persuasive of indicating an intent on the part of the testator that general legacies should be a charge upon the real estate. They are enumerated as follows:

1. The fact that since the making of the will there was a reduction of the personalty and an increase in the real estate.

2. The fact that in the residuary clause the realty and personalty are blended.

3. The nearness of relationship of the general and residuary legatees to the testator.

4. The fact that a power of sale is given in the will.

5. The inadequacy of personalty existing at the time the will is made.

6. The fact that testator directs payment of transfer taxes out of the corpus of the estate.

In *Matter of Lilienthal* (*supra*) Surrogate WINGATE analysed the precedents and came to the conclusion that the most effective of the six considerations above outlined as indicating to the courts an intent of the testator to charge legacies on real estate were the following: The direction to pay transfer taxes out of the corpus, the inadequacy of personalty at the time the will is made and the granting of a power of sale; that the blending of the realty and personalty in the residuary clause was not a very material consideration; and, finally, that as to the comparative relationship of the legatees to the testator, although quite worthy of consideration, the adjudications were too greatly in conflict to permit the formulation of any definite rule.

An examination of these later authorities on the subject may be of assistance.

In *Carley* v. *Harper* (*supra*) the general legacies aggregated $132,200. The amount of personalty of testatrix at the time she made the will was about $97,000. Her net personalty at the time of her death amounted to $82,000. Between the time she made the will and the date of her death she had expended $29,500 in the purchase of real estate. There was, consequently, about a twenty-five per cent deficiency of personalty at the time of her death to pay the general legacies. She did not specifically charge them upon the real estate. The question was whether an intention so to do could be found in the language of the will read in the light of extrinsic circumstances. After referring to the considerations mentioned above as indicating such intention, the court pointed out that there were present in the will under consideration the fact that there was about a twenty-five per cent deficiency of personalty to pay the legacies, a power of sale, a blending of real and personal property in the residuary clause, and a direction to pay the transfer tax out of the residue; all of which were in harmony with an intention to charge the real estate and said (at p. 303): " Whether or not when she executed it she expected that such

real estate would be sold to pay legacies we cannot say, but we can say that everything in the will is consistent with such an intention, and that the power of sale and the blending of real and personal property in the residuary clause compel the conclusion that she intended to mingle the personal and the real not specifically devised in a common fund. While we should not vex established rules to sustain mere conjectures, the artificial distinctions between wills of real and personal property should not be magnified when the circumstances surrounding the execution of the will permit the conclusion from the language thereof that the testatrix intended that the legacies should be paid (*Bevan* v. *Cooper*, 72 N. Y. 317), and that they were not meant to be nugatory or unavailing. (*Taylor* v. *Dodd*, 58 N. Y. 335.) The language of this will, construed by the aid of the surrounding circumstances, reveals such intention juristically and justifies a finding that the legacies are a charge upon the real estate."

In *Matter of Mould* (*supra*) testatrix had died without children or descendants, leaving a will in which she first directed payment of all her debts, funeral expenses and expenses of administration, and then gave legacies to a sister, nieces and nephews and to relatives of her deceased husband, totaling about $40,000, which were not specifically charged upon the real estate. She then left her residuary estate, both real and personal, " to Florence A. Coombs who grew up as a child in my family and lived with me for many years." She also gave her executor full power of sale. Her entire estate consisted of approximately $40,000, of which $20,000 was personalty and $20,000 real estate. Among her personalty were 20,000 shares of stock in a tin company and 200 shares of stock in a gold mining company. At the time of her death these stocks had no value. There was no proof, however, to indicate whether they had any value at the time testatrix made the will or whether she did not believe at that time that they would have sufficient value so that her personalty would have been sufficient to cover the general legacies.

It was established that Florence A. Coombs, the residuary legatee, stood in the mutually acknowledged relationship of parent and child to the testatrix.

Surrogate SLATER discussed the precedents and the considerations found effective in such precedents as indicating an intent to charge legacies on real estate. One of such considerations most deserving of attention was the fact of the disparity between the amount of the personalty and the amount of the legacies. This, however, as the learned surrogate pointed out, was not effective if the testatrix believed at the time she made her will that the personalty was

sufficient to pay the legacies. In the case before him for consideration there was nothing to indicate that the testatrix, in view of her ownership of the stocks in question, did not believe at the time she made her will that the personalty was sufficient to pay the legacies. The learned surrogate then pointed out that the two major reasons pervading all the precedents as indicating an intention to charge legacies on real estate were an existence of a power of sale in the will and the fact that the legatees were persons of the blood or persons who stood in the relationship of parent and child with the testatrix. In the case before him there was a power of sale in the will. This, however, he found to be offset by the fact that the general legatees were in a position of strangers to the testatrix as compared with the residuary legatee as to whom the testatrix stood in the relationship of parent and child, and holding the latter to be the compelling consideration under the circumstances presented, decided that the legacies should not be charged upon the real estate. In other words, in that particular case, the surrogate found that the existence of the power of sale and the blending of the realty and personalty in the residuary clause as indicating an intention to charge legacies on real estate were outweighed by the fact that there was lack of proof to indicate that testatrix knew or believed her personalty was insufficient to pay the legacies, and more particularly by the fact that the residuary legatee stood in the position of child to the testatrix whereas the general legatees were of more distant relationship.

In *Matter of Lilienthal* (*supra*) the testator, when he made the will, had personalty then worth about $10,000 and realty then valued at about $17,000, together with life insurance of about $3,300. The general legacies aggregated about $15,000, leaving a deficiency of personalty to pay the legacies of about $1,800. Debts, funeral and testamentary expenses aggregated about $2,000, so that the total deficiency of personalty to pay legacies was about $3,800, or twenty-five per cent. The residuary clause was in its usual form. The will contained no power of sale. The executor was directed to pay transfer taxes out of the estate. The general legatees were nephews and nieces of testator's wife toward whom he had shown great fondness, to whom he had made frequent gifts and with whom he was quite intimate. The residuary legatee was his aunt. Surrogate WINGATE held that the direction for the payment of transfer taxes out of the corpus and the inadequacy of the personalty to pay the legacies were substantially conclusive indications of testator's intention that the general legatees should be paid in full at the expense of the residuary real estate if

necessary; that the omission of a power of sale was entitled to little weight, and that such weight as is to be attached to closeness of relationship favored the general legatees over the residuary legatee.

Both Surrogates SLATER and WINGATE have held similarly in cases which later came before them. Thus in *Matter of Gabler* (140 Misc. 581) Surrogate SLATER held that the legacies were a charge on the real estate where the personal estate was insufficient, there was a blending of realty and personalty in the residuary clause and a direction to pay transfer tax out of the corpus, together with a power of sale to the executor; and in *Matter of McEvoy* (139 Misc. 349) Surrogate WINGATE held similarly in a case where, although at the time the will was made the personalty was sufficient to pay the legacies, it had become insufficient at the time of testator's death as a result of unfortunate investments by the testator in the meantime in Florida real estate, resting his decision upon that fact and upon the fact that the will contained a clause directing payment of inheritance taxes out of the residue as being one of the strongest indications of an intention to charge legacies upon real estate.

In the *Lilienthal Case* (*supra*) Surrogate WINGATE said (at p. 236): " This review would seem to demonstrate beyond reasonable question that the presence of a direction to pay transfer taxes from the body of the estate or a demonstration of inadequacy of personalty at the time of the execution of the will are substantially conclusive indications of an intent on the part of the testator to charge realty passing under a residuary clause, in favor of general legatees, and that the granting of a power of sale is entitled to only slightly inferior weight."

The above quotation indicates that the learned surrogate adduced from his examination of the authorities that the existence of either one of two features, namely, direction to pay transfer taxes from the residuary estate, or inadequacy of personalty at the time the will was made, is a substantial conclusive indication of the testator's intent to charge payment of legacies upon real estate. As he pointed out in that case, in the three authorities in which the will contained a direction to pay transfer taxes from the residuary estate it was held that the legacies were a charge upon the real estate. (*Ely* v. *Megie, supra; Carley* v. *Harper*, 219 N. Y. 295; *Matter of Sargent*, 215 App. Div. 639.) In those cases, however, as well as in the *Lilienthal* and *Gabler* cases, although emphasis was particularly laid upon the direction to pay transfer taxes out of the residue, nevertheless, the circumstance there existed that in each case the personalty at the time the will was

made was inadequate to pay the legacies in full. Nevertheless, the court in the *Lilienthal* case asserted that either that circumstance or the direction to pay the transfer taxes out of the residue constituted a substantially conclusive indication of intent to charge payment of legacies upon real estate.

In *Matter of Kinreich* (137 Misc. 735) it does not appear from the opinion of Surrogate Foley whether or not the personalty at the time the will was made was adequate to pay the legacies; but the surrogate, nevertheless, held them to be a charge on the real estate, saying (at p. 738): " The real estate in question was devised by the residuary clause to the widow. That clause blended the real and personal estate. The devisee was also named as executrix and as such was charged with the payment of the general legacies. In paragraph 15 of the will she and her coexecutor were given the power to sell the real estate at such times and in such manner as they might deem for the best interests of the estate. I hold, therefore, that the general legacies were charged against the real estate. (*Carley* v. *Harper*, 219 N. Y. 295, 301; *Brown* v. *Knapp*, 79 id. 136, 143.)"

In *Matter of Hanford* (136 Misc. 612) it appeared that at the time the will was made the personalty did exceed the amount of the legacies but by a small sum, the amount of the personalty being $1,529.57 and the amount of the legacies being $1,100; and the surrogate questioned whether, under those circumstances, the testatrix could have contemplated that her personalty would be sufficient to pay her legacies after payment of debts, funeral and testamentary expenses. That circumstance, however, the surrogate did not find conclusive, but considered in connection with the fact that the will contained what was practically a mandatory power of sale of the real property in order to accomplish its distribution and a blending of the realty and personalty; and upon that basis, made his determination that the testatrix intended to charge payment of the legacies on the real estate.

In *Matter of McEvoy* (*supra*) Surrogate Wingate again considered the question. It there appeared that at the time the will was made the personalty was considerably in excess of the amount of the legacies and that the deficiency of personalty to pay legacies at testator's death resulted from unfortunate investments in real estate made subsequent to the execution of the will. The will, however, contained the following clause (139 Misc. at p. 351): " I hereby direct my executors and trustees hereinafter named to pay out of my residuary estate all transfer or inheritance taxes that may be imposed upon any devise or legacy herein contained or any transfer thereof and that the same shall not be chargeable to or paid by any devisee or legatee herein named."

After citing his decision in the *Lilienthal* case, he said: " The conclusion was there reached that among the surest indications of an intent to create such a charge, was a testamentary direction for payment of inheritance taxes out of the residue of the estate (p. 234 and cases cited) " (139 Misc. p. 351), and held that thereby the testator intended the payment of his legacies to be a charge against his real estate.

Again, in *Matter of McKeogh* (151 Misc. 327), the same question was again before Surrogate WINGATE. There was no evidence before him of the condition of testator's estate as to adequacy of personalty to pay legacies at the time the will was made. Holding the payment of the legacies to be a charge upon the real estate, however, the surrogate said (at p. 328): " In the opinion of the court, the general structure and content of the will, particularly the desire evinced by the ' eighth ' item that the general legatees should be paid in full without deduction for estate taxes, is conclusive of an intention to charge the general legacies upon the residuary realty. (*Matter of Lilienthal*, 139 Misc. 225, 236; *Matter of McEvoy*, Id. 349, 351.) "

In *Matter of Carpenter* (152 Misc. 320) the personalty was apparently sufficient for payment of legacies at the time the will was made but had been largely exhausted before decedent's death. The power of sale was in the following form: " I authorize, empower and direct them to sell any or all of my real and personal property." Although there was no direction in the will for payment of transfer taxes out of the residue, Surrogate SLATER emphasized the use of the word " direct " in the power of sale as making it substantially a mandatory power of sale and also referred to the blending of realty and personalty in the residue. He accordingly held that there was such a blending, an equitable conversion of the realty, that the money legacies were first to be paid, and that they were a charge on the realty, upon the authority of *Carley* v. *Harper* and *Matter of Kinreich* (*supra*).

In *Matter of Sargent* (*supra*) the legacies under the will totaled $9,200. At the time she made her will the testatrix owned no real estate. The amount of personalty which she owned at that time was not definitely shown. However, she was to receive a legacy under another person's will, the amount of which turned out to be in excess of $5,000. Knowing that she was to receive such a legacy, but apparently not knowing the amount thereof, she made a codicil giving legacies totaling $4,400. From this it was to be inferred that at the time she made her will and codicils she contemplated her personalty to be adequate to pay her legacies. In the codicil she provided as follows: " I direct my Executor to

pay all inheritance taxes from my estate, so that each legatee may receive the full sum bequeathed to him or her, if my estate permits thereof." Some time after making the codicil the testatrix bought some lots and built a house. At her death her personalty aggregated approximately $11,000. The total amount of legacies given was $10,600. The personalty, after payment of debts, etc., was, therefore, insufficient to pay the legacies in full. Holding that they were a charge upon the real estate, the court said: "Also with this provision of the will must be read the provision in the codicil as to payment of the inheritance taxes, where her intent is in words expressed that the legacies should be paid in full ' if my estate permits thereof.' While words are not used in this will specifically charging the payment of general legacies upon the real estate, we find in the will and codicil the expressed intent that the general legacies should be paid in full, and, therefore, that they should be chargeable so far as necessary upon any real estate she might thereafter acquire."

The question has again been considered by Surrogate WINGATE in two more recent decisions:

In *Matter of Dooley* (153 Misc. 533) it appeared that at the time the will was made the value of testatrix's property was considerably less than the amount of her legacies. At the same time, however, it appeared that she was in excellent health and was in receipt of income from a trust fund, out of which she annually saved and accumulated enough so that within a year or two her personalty would be adequate to pay her legacies in full. Under such circumstances the surrogate declined to hold that there was any intent on her part to charge payment of the legacies upon real estate.

In *Matter of Hammer* (Surrogate WINGATE, Kings County, N. Y. L. J. Oct. 10, 1934, p. 1199) the personalty at the time the will was made was far more than adequate to pay all legacies in full, and the surrogate refused to decree that payment of such legacies was a charge upon the real estate.

It will be noted in the two cases last cited that there was no direction in the will for payment of transfer taxes out of the residuary estate and that consequently, the learned surrogate in those decisions in no way receded from the position taken by him in the *Lilienthal, McEvoy* and *McKeogh Cases* (*supra*), wherein he found that such a direction was a substantially conclusive indication of testator's intent to charge payment of his legacies upon his real estate.

In the authorities considered above, in which there was such a direction to pay transfer taxes out of the residue, we find the

following situation to exist at the time of the making of the will with reference to adequacy of personalty to pay legacies in full. In *Ely* v. *Megie, Carley* v. *Harper, Matter of Lilienthal* and *Matter of Gabler* it appeared that the personalty was insufficient. In *Matter of McKeogh* there was no evidence upon the point before the court. In *Matter of Kinreich* it does not appear from the opinion whether or not the personalty was sufficient. In *Matter of Sargent* and in *Matter of Carpenter* it was apparently sufficient. In *Matter of Hanford*, likewise, it was sufficient though the excess in value of personalty over the amount of legacies was small. In all those cases it was held to have been the intent of the testator to charge payment of legacies upon real estate.

In the instant case the testator in his will blended realty and personalty in his residuary estate and gave the same to his executors in trust for the benefit of his children and their issue. He gave his executors the following powers:

"*Seventh.* I authorize and empower my said executors and trustees as follows:

"1. To value, for purposes of division or distribution, any or all of my estate, real or personal, their valuation of the same to be final and conclusive, and to divide or distribute the same according to such valuation.

"2. To sell, either at public or private sale, any of my estate, real or personal, and to lease any of my real estate, in their discretion, for terms not to exceed twenty-one years.

"3. To hold as part of any of the trust funds created by my will any of the property, real or personal, of which I may die possessed, and to invest and reinvest the proceeds of any sold in the mortgage bonds of any railroad or industrial corporation organized under the laws of any of the United States, which company shall have continuously paid dividends upon its common or preferred stock for at least three years previous to such investment, or in the preferred stock of any such corporation which shall have continuously paid dividends upon its common stock for at least three years previous to such investment, or in any securities lawful for the investment of trust funds.

"4. To compound, compromise and submit to arbitration any claim in favor of or against my estate.

"5. To retain and hold in their discretion as a part or parts of any trust fund or funds hereinbefore created, any and all real estate located in the Township of Oyster Bay, County of Nassau and State of New York, owned by me at the time of my death, for such periods of years as may seem to them wise, and in their discretion to expend such sum or sums as they may think advis-

able for the laying out and building of roads, or any other general improvement of said property, such sum or sums so spent to be chargeable against the principal of the trust fund and not against the income."

He then further provided:

" *Tenth.* I wish all my specific and general legatees to receive their legacies free and clear of all transfer, inheritance or legacy taxes, and I direct that all such taxes be paid out of my residuary estate."

In his first codicil he expressly ratified and confirmed that provision.

In his second codicil he provided as follows:

" *Second.* I wish all my specific and general legatees to receive their legacies free and clear of all transfer, inheritance or legacy taxes, and I direct that all such taxes upon the legacies set forth in this second codicil of my will, as well as in the first codicil thereof be paid out of my residuary estate."

This provision he again ratified and confirmed in both his third and fourth codicils.

He, therefore, made as clear and definite as possible his intention that the legacies should be paid free and clear of all taxes, and that all taxes upon such legacies should be paid out of his residuary estate.

I am inclined to the belief that such a provision is perhaps even more indicative of a testator's desire and intention that his legacies should be paid in full, even though it might be necessary to apply his real estate to that purpose, than the circumstance of inadequacy of personalty to pay legacies at the time he makes his will. Having present in the testamentary instruments now under consideration such a direction reiterated and repeated in clear and undisputed terms, coupled with the consideration of blending of realty and personalty in the residuary estate and the provisions in the power of sale to the executors, I reach the conclusion that payment of the general legacies should be decreed to be a charge upon the real estate.